UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GREGORY LAMBERT ) | | |
| ) | | |
| Petitioner, ) | | |
| ) | | |
| v. ) | Civil Action No. 04-12694-DPW | |
| ) | | |
| MICHAEL A. THOMPSON, ) | | |
| ) | | |
| Respondent. ) | | |

MEMORANDUM OF THE RESPONDENT
IN SUPPORT OF MOTION TO DISMISS

The respondent submits this memorandum in support of his motion to dismiss the petition for writ of habeas corpus filed by Gregory Lambert ('the petitioner") who was convicted in 2003 of trafficking and distributing cocaine and drug dealing within 1000 feet of a school by a Hampden County judge in a jury-waived bench trial.  His conviction was affirmed by the Massachusetts Appeals Court, *Commonwealth v. Lambert,* 61 Mass. App. Ct. 1106, 808 N.E. 2d 1257 (2004), and his application for leave to obtain further appellate review was denied,  *Commonwealth v. Lambert*, 442 Mass. 1104, 810 N.E. 2d 1229 (2004).[1]

The petitioner raises only one claim in his petition, i.e., the evidence was insufficient to support the convictions.  (Petition, p. 5, ¶ 12A).  He asserts that the Commonwealth never presented evidence that he was a drug dealer known as "Junior" and claims that he was not present during any of the drug distributions.  Further,  the petitioner asserts that

---

[1]   The respondent is submitting documents and the trial transcripts from the petitioner's state court proceedings with this Memorandum.  The briefs and court decisions will be referenced by Exhibit number and page as (Exh. 1 at 1).  The three volumes of trial transcripts will be referenced by volume number and page as (Tr.I/18).

2

the evidence seized in an apartment where drugs and paraphernalia were found did not support the conviction for trafficking where the evidence did not demonstrate that he had any connection with or knowledge of the cocaine found in the apartment." (Petition, p. 5, ¶ 12A).

As discussed more fully below, the petitioner has failed to prove that the state court adjudication by the Massachusetts Appeals Court rejecting his sufficiency of the evidence claim was contrary to nor an unreasonable application of *Jackson v. Virginia*, 443 U. S. 307 (1979) which established the federal constitutional standard for reviewing sufficiency claims. *Hurtado v. Tucker*, 245 F. 3d 7, 13 (1st Cir. 2001). The Massachusetts Appeals Court analyzed the petitioner's sufficiency of the evidence claim under the state test of *Commonwealth v. Latimore*, 378 Mass. 671, 676-677, 393 N.E.2d 370 (1979) which, according to the United States Court of Appeals for the First Circuit, is "essentially identical" to the *Jackson* standard. *Nadworny v. Fair*, 872 F.2d 1093, 1102 (1st Cir. 1989). See *Hurtado*, 245 F. 3d at 12. The Appeals Court's decision was not an unreasonable application of *Jackson* and *Latimore* and the petition should be dismissed for failure to state a claim upon which habeas corpus relief can be granted.

## STATEMENT OF THE CASE

On September 8, 1999, a Hampden County grand jury returned indictments alleging that on or about June 28, 1999, the petitioner did traffick in cocaine with a net weight of 28 grams or more, but less than a hundred grams [99-1900]; on or about June 28, 1999, the petitioner did violate the provisions of sections 32(A)-(I) of G.L. c. 94C, while in, on, or within one thousand feet of a school, namely: Massachusetts Career Development

3

Institute [99-1901]; on or about June 2, 1999, the petitioner did knowingly or intentionally manufacture, distribute, or dispense cocaine [99-1902]; on or about June 1, 1999, the petitioner did knowingly or intentionally manufacture, distribute, or dispense cocaine [99-1903]; on or about Lambert did knowingly or intentionally manufacture, distribute, or dispense cocaine [99-1904]; on or about May 24, 1999, the petitioner did knowingly or intentionally manufacture, distribute, or dispense cocaine [99-1905]; and on or about May 24, 1999, the petitioner did violate the provisions of sections 32(A)-(I) of G.L. c. 94C, while in, on, or within one thousand feet of a school, namely: the Kensington Avenue School. [99-1906].

On January 29, 2003, during a bench trial, Justice Peter A. Velis granted the petitioner's Motion for a Required Finding of Not Guilty at the close of the Commonwealth's evidence on indictments 99-1905 and 99-1906. At the close of trial of the evidence, the judge entered a finding of not guilty on indictment 99-1904, but found the petitioner guilty on the remaining four indictments (99-1900 through 99-1903). On January 31, 2003, the judge sentenced the petitioner to five years to five years and a day at MCI-Cedar Junction on indictment 99-1900 for cocaine trafficking; on indictment 99-1901 for trafficking within a school zone, he sentenced the petitioner to two years at the Hampden County House of Correction, from and after the sentence imposed on 99-1900; on indictment number 99-1902 for cocaine distribution, he sentenced the petitioner to 2½ years at the Hampden County House of Correction, concurrent with the sentence imposed on 99-1900; and on indictment 99-1903 for cocaine distribution, he sentenced the petitioner to 2½ years at the Hampden County House of Correction, concurrent with the sentences

4

imposed on 99-1900 and 99-1902.

The petitioner filed a timely notice of appeal and, on May 20, 2004, the Massachusetts Appeals Court affirmed his conviction in an unpublished opinion. *Commonwealth v. Lambert*, 61 Mass. App. Ct. 1106, 808 N.E. 2d 1257 (2004)(Exh. 3). His application for leave to obtain further appellate review was denied on June 30, 2004. *Commonwealth v. Lambert*, 442 Mass. 1104, 810 N.E. 2d 1229 (2004)(Exh. 4, 5).

The instant petition was filed on December 23, 2004.

## STATEMENT OF FACTS

The Massachusetts Appeals Court's recitation of the facts of the petitioner's crimes is entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (1981) (holding that presumption of correctness under former habeas statute applied to "factual determinations made by state courts, whether the court be a trial court or an appellate court").

In *Commonwealth v. Lambert*, 61 Mass. App. Ct. 1106, 808 N.E. 2d 1257 (2004)(Exh. 3), the Appeals Court adopted the following description of the crimes for which the petitioner was convicted from the Commonwealth's brief:

> **May 24, 1999 (Indictment numbers 99-1905 and 99-1906, both of which were dismissed after allowance of required findings of not guilty).**
>
> From May 1999 to June 1999, Patrolman Marcus Lawrence, an undercover narcotics officer with the Springfield Police Department, became involved in a narcotics investigation surrounding an individual known to him as "Junior." A series of controlled drug purchases were made as a result of surveillances conducted

5

during this investigation.  (Tr.I/18).

On May 24, 1999, Officer Lawrence made his first contact with "Junior" by cell phone using a number provided to him by an informant. A person identifying himself as "Junior" answered the call.  (Tr.I/19-20). When "Junior" questioned Officer Lawrence as to how he had obtained his phone number, Officer Lawrence gave him the names of several individuals he believed "Junior" was likely to know.  (Tr.I/20).

Officer Lawrence told "Junior" that he was interested in purchasing two "50 pieces" of crack cocaine. "Junior" told him to go to 221 Orange Street in twenty minutes. A woman, whose clothing he described, would meet him there.  (Tr.I/21,77). Officer Lawrence proceeded to the designated address with $100 in prerecorded buy money.
(Tr.I/23).

As he arrived at 221 Orange Street, Officer Lawrence observed a black woman, matching the description he had been given, walking down the front stairs of that building and towards his car. At first she walked past his car, looking into it. Then she turned back and spoke to him: "Is that you?" When Officer Lawrence responded affirmatively, the woman got into his car. She mentioned that the "cops" had been out earlier and suggested that he drive around to the back of the building.  (Tr.I/25,47,78-79). The woman then got out of the car and went back into the building.  (Tr.I/30).

As Officer Lawrence turned his car around to head towards the rear of the building, he noticed a black male, later identified as the [petitioner], wearing a long-sleeved dark shirt, a large gold chain around his neck, and dread locks, standing on the open second floor porch, looking down at the woman. He was "watching ... watching her leave, watching her approach the car ... looking up and down the street." (Tr.I/27-29,78,86,122).[2]  Officer Lawrence made eye contact with the [petitioner] as he drove along side of the house. They held eye contact until Officer Lawrence could no longer see him.  (Tr.I/28,79-81).

In the parking lot behind 221 Orange Street, Officer Lawrence observed the woman coming down the back stairs of the building. She stood on the rear, first floor porch, and directed him to join her. She then spat out two individually

---

[2]    From his surveillance position, Sergeant Thomas Meleady, supervisor of the undercover investigation, observed all of these events as they occurred in front of 221 Orange Street.  (Tr.I/93-94,95-97).  He observed the [petitioner] moving in and out of the house during the time that Officer Lawrence was there and for some time after the officer left.   (Tr.I/95-97,98101).

6

wrapped rocks of crack cocaine from her mouth. The officer paid her for them with the buy money. (Tr.I/ 29-31,35,82). The woman told the officer that he could come back and she would take care of him if "Junior" were not around. She gave Officer Lawrence one of "Junior's" business cards with his cell phone number on it. (Tr.I/32-33; C.A./l)

**May 25, 1999 (Indictment number 99-1904 resulting in a finding of not guilty).**

On May 25, 1999, using the cell phone number on the business card he had received from the woman, Officer Lawrence called "Junior" again requesting to purchase three "50 pieces" of crack cocaine. Officer Lawrence asked if the sale would take place at the same location as the day before. "Junior" responded that he was not at "that place" but instead, was at 124 Mass. Avenue. He told Officer Lawrence to meet him there in twenty minutes. (Tr.I/36,42). Officer Lawrence notified other officers who set up surveillance at 124 Mass. Avenue. (Tr.I/36).

When Officer Lawrence arrived at 124 Mass. Avenue, he parked, and, after a short time, he observed a young black male come out of that building and approach the officer's car. The young man asked the officer, "Is that you? Is it O.K. if I get in the car?" and then got in. (Tr.I/39-41,83). From his voice, the officer knew that this individual, later identified as Dedlon Gelin, was not "Junior." (Tr.I/43,64). The three rocks that Officer Lawrence then bought from Gelin were subsequently identified as cocaine. (Tr.I/44). The police did not see the [petitioner] on this day. (Tr.I/83).

**June 1, 1999 (Indictment number 99-1903, which resulted in a guilty finding).**

Officer Lawrence contacted "Junior" again by cell phone asking to purchase four rocks of cocaine at fifty dollars a piece. (Tr.I/52). Again, the officer was directed to go to 124 Mass. Avenue in twenty minutes. Officer Lawrence notified surveillance officers and went to that location with prerecorded buy money. Again; once at that address, he was met by Gelin who got into his car. Gelin directed Officer Lawrence to drive to the area of Dunmoreland Street where he made the sale. (Tr.I/53,83). Afterwards, Gelin gave Officer Lawrence one of "Junior's" business cards and left. (Tr.I/65,67-68; C.A./1).

From his surveillance position farther down Mass. Avenue, Sgt. Meleady observed the transaction between Officer Lawrence and Gelin. (Tr.I/102). Afterwards, he observed Gelin, the [petitioner],[3] and one or two other individuals leave 124 Mass. Avenue and get into a taxi. (Tr.I/103-104,118,133). Based on

---

[3] Sgt. Meleady referred to the [petitioner] as "the main target of our investigation as Junior." (Tr.I/124).

information he had received, that the taxi was headed for 221 Orange Street where a drug transaction was to take place, Sgt. Meleady advised his officers to tail the taxi from 124 Mass. Avenue to 221 Orange Street. (Tr.I/104,116,133). Once the taxi arrived at 221 Orange Street, take down officers, relying on descriptions they were given of the [petitioner] and Gelin,[4] executed their orders and arrested Gelin, and made an identification of the [petitioner]. (Tr.I/105,117,124,130,134,139-140; 11/5,9). The other individual in the taxi was identified as Steven Charles. (Tr.I/132,140). Although Gelin was arrested, he was apparently bailed out later that afternoon since he sold drugs to Officer Lawrence the next day. (Tr.I/106,117,134,138).

**June 2, 1999 (Indictment number 99-1902, which resulted in a guilty finding).**

Officer Lawrence contacted "Junior" again by cell phone. (Tr.I/56,60). He asked to purchase a half ounce of cocaine,[5] but "Junior" did not want to sell this large amount to him. He agreed, instead, to sell him "a five," or five pieces of cocaine at fifty dollars apiece. Again, "Junior" directed officer Lawrence to go to 124 Mass. Avenue to complete the sale. (Tr.I/57).

When he arrived at 124 Mass. Avenue, Officer Lawrence was met again by Gelin who told the officer he had been stopped by police the day before and suggested that they drive to the Dunmoreland, Westford Circle area to complete the sale. (Tr.I/62).

**June 28, 1999 (Indictments 99-1900 and 99-1901, both resulted in guilty findings).**

On June 28, 1999, Officer Lawrence contacted "Junior" and arranged to buy more cocaine at 124 Mass. Avenue. (Tr.I/69-70). Officer Cassillas was parked in front of 124 Mass. Avenue in his undercover vehicle. Using binoculars, Officer Cassillas observed a white Acura, fitting the description he had been given, pull up to that address. Two black males, "targets of [their] investigation]" who also fit descriptions he had been given, were in the car. (Tr.II/98-101).

The [petitioner] was driving the Acura. (Tr.II/100). Gelin was the passenger. (Tr.II/101). Both men entered the building at 124 Mass. Avenue. (Tr.II/101). Officer Lawrence arrived and Gelin got into his car. (Tr.II/73). They drove to the end of

---

[4] Officers were advised that one of the car's occupants was 5'4" tall and would be carrying the narcotics. Gelin fit the physical description and had narcotics on his person. (Tr.I/138-139).

[5] This amount would be the equivalent of approximately six rocks of cocaine. (Tr.I/61).

8

Mass. Avenue at Westford Circle, and made the transaction. (Tr.II/71-72).[6] At that point, Officer Cassillas gave other surveillance officers a prearranged take down signal. They came in and stopped Officer Lawrence's car. Gelin was arrested. (Tr.I/138; 11/71-72).[7]

Based on information Sgt Meleady received before the investigation commenced, and based on the observations of Officer Lawrence and other surveillance officers, Sgt. Meleady entered and secured the third floor of 124 Mass. Avenue. (Tr.I/107-124). Sgt. Meleady went directly up the rear stairs to the third floor apartment. This was Sgt. Meleady encountered the [petitioner] as he was coming out of the back door of that apartment and heading toward the stairs. (Tr.I/108,110,119,124). Sgt. Meleady handcuffed the [petitioner] and searched him for weapons, but found "nothing at all on him." (Tr.I/109,119; 11/78,104). Other officers entered the apartment, and secured Steven Charles and another individual. (Tr.I/109).

The apartment contained a kitchen, two bedrooms, and a bathroom. (Tr.I/111). During the search, conducted pursuant to a warrant, officers located two digital scales and packaging materials inside the kitchen cabinets. (Tr.II/8,10-12). Cell phones and beepers were found in the apartment. (Tr.I/120-121).

Sgt. Meleady searched the front bedroom. It contained a mattress on the floor, and a dresser. Men's clothing and shoes were strewn around the room and in the closet. There were no women's or children's clothing found in the room. Officers recovered a bag containing a single chunk of cocaine, weighing 4.7 grams, in the pocket of a pair of pants hanging on the closet door. (Tr.I/112,115;II/81,8993, 95).

A black sock containing a large rock of cocaine weighing 85 grams with 65.2% purity, and a wholesale value of approximately $2400, was recovered from under the carpet beneath the dresser in the front bedroom. (Tr.II/55-57,68,73-75). Sgt. Meleady found a wallet containing personal papers, a photo I.D. of the [petitioner], a photo of the [petitioner] and a female, and another of Junior's business cards on the dresser. (Tr.I/113,119-120; C.A./1-3). A police scanner was found inside the dresser. (Tr.II/8).

---

[6] The items sold to Officer Lawrence were later identified as crack cocaine. (Tr.I/73).

[7] The only time Officer Lawrence ever saw the [petitioner] was during the May 24th purchase he made at 221 Orange Street. (Tr.I/74-75,83-85,90,121).

9

      A narcotics expert identified the substance recovered as crack cocaine. In his opinion, the large quantity and size of the chunk of cocaine was not consistent with personal use but, instead, was intended to be broken down and sold. (Tr.II/63-64). The expert also described how this large chunk of cocaine would typically be broken up and packaged for sale.[8] He stated that the drugs he was shown, from the three sales made by Gelin to Officer Lawrence, were packaged consistently with the typical way drugs were packaged for sale. (Tr.II/65-67). Also pertinent to his opinion that the drugs were intended to be broken down for sale was the recovery of the digital scales. The expert testified, "I mean, you take into context the whole set of circumstances you have regarding the investigation, what led up to the investigation, the recovery of these items, what was recovered with the items." (Tr.II/64).

      Officers recovered nine bags of powdered narcotics inside a plastic bag in a shirt pocket in the closet of the back bedroom. (Tr.I/136; 11/13,8285). Also in the closet, inside a boot, officers retrieved four plastic bags, each containing one rock of cocaine. (Tr.II/82,84). A firearm was also recovered in that bedroom (Tr.I/137; 11/11,14). Strewn around the back bedroom were various personal papers belonging to Steven Charles. (Tr.II/13). (Tr.II/65-68).

Brief and Appendix For the Commonwealth, *Commonwealth v. Gregory Lambert*, A.C. No. 2003-P-1013 (Exh. 2 at 1-11.)

## ARGUMENT

**THE STATE COURT ADJUDICATION WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF *JACKSON V. VIRGINIA*, 443 U. S. 307 (1979).**

A. STANDARD OF REVIEW

Because the instant petition for writ of habeas corpus was filed after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), review of the petitioner's claims is governed by that statute. *Lindh v. Murphy,* 521 U.S. 320, 336 (1997). The relevant statutory provision, 28 U.S.C. § 2254(d)(1), states:

---

    [8] The expert described how individual "rocks" of cocaine, valued at approximately fifty dollars each, known on the street as "a fifty," would be broken off of the larger chunk and placed in a baggie which would be tied and torn off at the corner.

10

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;

In *Williams v. Taylor,* 529 U.S. 362, 412 (2000) (O'Connor, J., Opinion of the Court) the Supreme Court gave independent meaning to both the "contrary to" and the "unreasonable application" clauses of the statute.  *See id*. at 405.  Under the first prong of § 2254(d)(1), the Court stated that a decision may be "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), in two ways.  First, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams,* 529 U.S. at 405.  Second, "[a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 405-406. [9]

The Court interpreted the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," a phrase shared by both clauses, to "refer[] to

---

[9] Under both scenarios, "contrary to" means "diametrically different," "opposite in character or nature," or "mutually opposed," such that— as the text of relevant precedent of this Court" in order to satisfy the "contrary to" clause. *Williams v. Taylor*, 120 S.Ct. at 1519.  Justice O'Connor emphasized that a "run-of-the-mill state-court decision applying the correct legal rule from [its] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id*. at 1520.

**11**

the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. The statute thus "restricts the source of clearly established law" to the Supreme Court's holdings. *Id.*

Under the second prong of § 2254(d)(1), "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case" qualifies as "'an unreasonable application of . . . clearly established Federal law.'" *Id.* at 407 (quoting 2254(d)(1)). In determining whether a state-court decision unreasonably applies Supreme Court precedent, "a federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. As the Court stressed, "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). Under the "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. *Id.* at 411. The First Circuit recently explained the degree of error that must be shown by the petitioner to reach the level of an "objectively unreasonable" state court decision. "[S]ome increment of incorrectness beyond error is required….The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir. 2000)).

12

## B. SUFFICIENCY OF THE EVIDENCE

Under 28 U.S.C. § 2254(d)(1) the focus of an inquiry by a habeas court considering a a sufficiency challenge to a conviction is the reasonableness of the state court decision. *Hurtado*, 245 F.3d at 18. *See Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000) Here the state appellate court applied the Massachusetts equivalent of *Jackson v. Virginia*, 443 U.S. 307 (1979), the clearly established Supreme Court precedent governing challenges to the sufficiency of the evidence. Under *Jackson*, the appellate court must consider the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. at 319. [10]

Habeas petitions which challenge the sufficiency of the evidence upon which their conviction rests do not implicate the "contrary-to" strand of the habeas statute since the state court adjudications at issue are essentially "a run-of-the-mill state court decision applying the correct legal rule from the [Supreme Court's] cases to the facts of a prisoner's case." *Hurtado*, 245 F. 3d at 15, quoting *Williams*, 529 U.S. at 406. The habeas court must turn to the second prong and determine whether the state court decision was an unreasonable application of *Jackson v. Virginia.*

Under *Jackson*, a reviewing court may only consider whether a rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson,* 443 U.S. at 324. The

---

[10] **Both the First Circuit and Supreme Judicial Court consider the *Jackson* test "essentially identical" or "substantially comparable" to the Massachusetts directed verdict standard long applied by the state appellate courts. *Nadworny v. Fair*, 872 F.2d at 1102*; Commonwealth v. Latimore*, 378 Mass. at 677.**

13

reviewing court does not weigh the evidence, and "must accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Kelly v. Roberts*, 998 F.2d 802, 808 (10th Cir. 1993). Nor should it "reread the record from the petitioner's perspective", *Palmariello v. Superintendent of M.C.I. Norfolk,* 873 F. 2d 491, 493 (1st Cir.), *cert. denied*, 493 U.S. 865 (1989), or make its own subjective determination of guilt or innocence, *Herrera v. Collins,* 506 U.S. 390, 401(1993), *quoting Jackson*, 443 U.S. at 318-319. [11]

In *Hurtado*, the First Circuit suggested guidelines as to some principles to be applied in an insufficiency-of-the-evidence case in making the evaluation of "objective unreasonableness" under §§ 2254(d)(1):

**(1) The focus of the inquiry is on the state court decision;**

**(2) Even with the deference due by statute to the state court's determinations, the federal habeas court must itself look to "the totality of the evidence" in evaluating the state court's decision;**

**(3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;**

**(4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and**

---

[11] **Prior to AEDPA, it was the practice of a habeas court to make the inquiry** *de novo* "on a cold record without any special deference to either the state's highest court, *see Jackson*, 443 U.S. at 318- 25, or the federal district court, *see Scarpa v. DuBois*, 38 F.3d 1, 9 n. 5 (1st Cir.), *cert. denied*, 513 U.S. 1129 (1994), beyond the persuasive power of their (conflicting) interpretations of the record." *Stewart v. Coalter*, 48 F.3d 610, 614 (1st Cir.), *cert. denied*, 516 U.S. 853 (1995). **With the passage of AEDPA,** *de novo* **review has been explicitly rejected in favor of a deferential standard of review,** *Williams*, **120 S. Ct. at 1519, in which the state court's adjudication of the evidentiary sufficiency claim becomes the focus of the inquiry and the measuring rod is whether the decision was an unreasonable application of** *Jackson'*s **core holding.**

14

> (5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

*Hurtado*, 245 F. 3d at 18.

## C. APPLICATION

In the case at bar, this court should defer to the judgment of the Massachusetts Appeals Court which scrutinized and gave appropriate weight to all the evidence in the case; considered the key arguments of the petitioner; and properly applied their own precedent. *Hurtado*, 245 F. 3d at 18.

The First Circuit has held that the rule in *Jackson* must be applied with "specific reference to the elements of the offense as defined by state law," *Campbell v. Fair*, 838 F.2d 1, 4 (1st Cir. 1998), *quoting Jackson*, 443 U.S. at 324. *See also Daughtry v. Dennehy*, 946 F. Supp. 1052 (Mass. 1996). Under Massachusetts law a person is guilty of trafficking in a controlled substance such as cocaine if he is found to be "knowingly or intentionally manufacturing, distributing or dispensing or possessing with the intent to manufacture, distribute or dispense...." such a substance. G.L. c. 94 (c), § 32(E)(b). In Massachusetts, a conviction of possession, trafficking or intent to distribute may be found when the defendant knew of the presence of the controlled substance and "had the ability and intention to exercise control and dominion over it." *Commonwealth v. Cruz*, 34 Mass. App. Ct. 619, 621, 614 N.E.D. 702, 704 (1993). *See Hurtado v. Tucker*, 245 F. 3d at 12. Where a defendant is not in actual possession of the narcotics, the Commonwealth may prove that he was in constructive possession of the drugs, that is, he knew of the location of the drugs and was able to exercise dominion and control over them. *Commonwealth v. Nichols*, 4

15

Mass. App. Ct. 606, 613 (1976).  "The elements of control and power or knowledge coupled with the ability and intention to exercise dominion and control may be inferred from circumstantial evidence." *Commonwealth v. Brown,* 34 Mass. App. Ct. 222, 225, 609 N.E.2d 100, 102 (1993).  "While the presence in an area where contraband is found alone cannot show requisite knowledge, power or intention to exercise dominion and control over the [contraband]..presence supplemented by incriminating evidence will serve to tip the scale in favor of sufficiency."  *Commonwealth v. Handy*, 30 Mass. App. Ct. 776, 780, 573 N.E.2d. 1006, 1009 (1991).

In its decision, the Massachusetts Appeals Court identified and applied the correct *Jackson/Lattimore* standard in assessing the evidence supporting the petitioner's conviction.  *See Commonwealth v. Lambert,* 61 Mass. App. Ct. at 1106(Exh. 3).  The court relied in part on the reasons submitted by the Commonwealth in its brief in which the prosecution argued that taken together "the trial judge could connect all of the pieces of the puzzle and create a picture of the [petitioner's] method of operation.  In order to insulate himself from exposure, he would send a runner or a 'mule' to make an actual sale from the stash house." (Exh. 2 at 27-28).  The Appeals Court reviewed the evidence in light of Massachusetts law and specifically rejected the petitioner's contention that there was insufficient evidence that (1) he constructively possessed the cocaine that served as the basis for the trafficking indictment, and (2) he was a joint venturer in the sales of cocaine to the undercover officers.  It reasonably applied *Jackson* when it concluded that, viewed in the light most favorable to the Commonwealth, the evidence, and reasonable inferences therefrom, was sufficient to prove that the petitioner constructively possessed the

16

eighty-five grams of cocaine found by the police in a sock under the carpet beneath the front bedroom dresser, and thus was guilty of trafficking in a controlled substance. The court reasoned:

> In addition to the [petitioner's] presence at the apartment, "plus factors" buttress the inference that the [petitioner] had knowledge of the drugs and the ability to exercise dominion and control over them. *See Commonwealth v. Acosta*, 416 Mass. 279, 284 (1993). Found on the dresser was the [petitioner's] wallet, which contained his photo identification, a photograph of the [petitioner] and a woman, other personal papers, and the business card of "Junior." Inside the dresser was a police scanner; men's clothes were strewn all over the floor and in the closet. The size and purity of the chunk of cocaine, together with the sales to the undercover officer, support the conclusion that the cocaine was intended for distribution. *See Commonwealth v. Navarro*, 39 Mass.App.Ct. 161, 168 (1995) (inferences need only be reasonable and possible, not necessary or inescapable).

In his Legal Memorandum in Support of Petitioned Under 28 U.S. C. § 2254 For Writ of Habeas Corpus, the petitioner reprises his argument from his appellate brief that there was no direct evidence that he leased or owned the apartment[10]; that he even knew of the hidden drug stash; or that he owned the clothing strewn about the place. (Pet. Legal Memorandum at 5-10). However, as the Commonwealth pointed out, the petitioner was observed coming to and going from 124 Mass. Avenue. On June 1, 1999, the petitioner, Charles, and Gelin came out of 124 Mass. Avenue and got into a taxi shortly after Gelin had made a drug sale to Officer Lawrence. (Tr.I/103-104, 118, 133). The men traveled to 221 Orange Street where the petitioner was seen on May 24, 1999 during a drug sale

---

[10] It is not essential that a defendant have a property interest in the premises where illegal narcotics are found since that is only one kind of circumstantial evidence used to prove knowledge or constructive possession. *See Commonwealth v. Arias*, 29 Mass. App. Ct. 613, 563 N.E.2d 1379 (1991).

17

prearranged by "Junior." (Tr.I/53,83). On June 28, 1999, the petitioner was observed driving Gelin to 124 Mass. Avenue in a white Acura. Both men then entered the building at that address. (Tr.II/100-101). Later, Sgt. Meleady apprehended the petitioner as he emerged from the only apartment on the third floor. (Tr.I/108,111).[11]

Besides the petitioner's presence at the apartment, other factors buttressed the inference that the petitioner was the drug selling occupant of the third-floor front bedroom where the drugs were found. The Appeals Court cited the most incriminating evidence linking the petitioner to the secret stash and indicating his access, dominion and control of the hidden drugs, i.e., his wallet containing his photo I.D. card, a photograph of him with a women, other personal papers and one of Junior's business cards found on the dresser in the front bedroom where mens clothing was found. There was a police scanner inside the dresser and a large chunk of cocaine hidden under the dresser which a narcotics expert testified was of a size consistent with distribution rather than personal use. Cocaine was also found in a pocket of a men's pants in the room and digital scales and packaging materials, common accessories of narcotics operations, were found in the kitchen.

In his second point, the petitioner asserts that there was no evidence that he operated a joint venture to sell narcotics with Gelin but the Appeals Court dismissed this contention as well:

> Similarly, there was sufficient evidence that the [petitioner] was a joint venturer in the sales made by Dedlon Gelin to Officer Lawrence. *See*

---

[11] In the light most favorable to the Commonwealth, it can be reasonably inferred that the petitioner was leaving the third floor apartment when he did because Gelin, his seller, who had just been arrested after the controlled buy to Officer Lawrence, had not come back to the apartment with the sale proceeds, as planned.

18

*Commonwealth v. James*, 30 Mass.App.Ct. 490, 499 (1991). The police observed the [petitioner] in the vicinity of the first sale, arranged with "Junior" from 221 Orange Street (on which the judge entered a required finding of not guilty). The police also observed the [petitioner] coming and going from the stash house at 124 Massachusetts Ave. and found items of his personal property inside. Considered together with the fact that the sales made by Gelin were arranged through a third party known as "Junior," this evidence was sufficient to permit the inference that the [petitioner] was directing the sales from behind the scene. In sum, we agree that the Commonwealth introduced a "mosaic of evidence" that warranted the trial judge's denial of the [petitioner]'s motions for a required finding of not guilty. See *Commonwealth v. Gendraw*, 55 Mass.App.Ct. 677, 686 (2002).

The Appeals Court's affirmation of the verdict was not objectively unreasonable. *Hurtado*, 245 F. 3d at 19. The state court addressed the points at issue after surveying the record of the case and articulated its reasons for its decision based on the testimony at trial viewed in the light most favorable to the Commonwealth. As the Supreme Court noted in *Wright v. West*, 505 U.S. 277, 296 (1992), the *Jackson* decision "emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." The prosecution need not rule out every hypothesis except that of guilt; a reviewing court must presume that the trier of fact resolved any conflicts in favor of the prosecution and must defer to that resolution. *Jackson*, 443 U.S. at 326. The First Circuit has warned that federal courts should be particularly cautious about issuing habeas, on grounds of objective unreasonableness on a state court's conclusion that the evidence is insufficient, where *inter alia* there is no claim of constitutional error in the conduct of the trial." *Hurtado*, 245 F. 2d at 20. The Appeals Court provided "fair process and engaged in reasoned, good faith decision making when applying *Jackson's* 'no rational trier of fact test.'" *Gomez v. Acevedo*, 106 F. 3d 192, 198 (7th Cir. 1996), vacated on other grounds, 522 U.S. 801 (1997). Their decision was not an

19

unreasonable application of *Jackson* and the petition should be dismissed for failure to state a claim upon which habeas relief can be granted.

## CONCLUSION

For the above-stated reasons, the motion to dismiss should be allowed.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

/s/ Annette C. Benedetto
Annette C. Benedetto
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
BBO No. 037060

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the petitioner's counsel by first class mail, postage pre-paid, on March 16, 2005, at the following address:

Thomas C. Foley, Esq.
P.O. Box 2187
So. Hamilton, MA 01982          /s/ Annette C. Benedetto
                                 Annette C. Benedetto
                                 Assistant Attorney General

## CERTIFICATE OF CONSULTATION

Pursuant to Local Rule 7.1 (A) (2), the respondent's attorney certifies that she telephoned the petitioner's counsel on March 16, 2005 and left a message on voice mail in order to confer with counsel about the motion to dismiss. The respondent's counsel had not received a call back by the time the papers were delivered to the AGO mail room.

/s/ Annette C. Benedetto
Annette C. Benedetto
Assistant Attorney General